UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

RICHARD SMITH,

                            Plaintiff,

v.                                                          5:05-CV-0957
                                                            (GTS/GJD)
NOVELIS; ALCAN ALUMINUM  CORP.;
LIBERTY LIFE ASSURANCE CO. OF BOSTON;
and LIBERTY MUTUAL,

                            Defendants.
_____

APPEARANCES:                              OF COUNSEL:

OLINSKY SHURTLIFF LLC                     HOWARD OLINSKY, ESQ.
  Counsel for Plaintiff                   WILLIAM J. LAMITIE, ESQ.
300 S. State Street, 5th Floor
Syracuse, NY 13202

LITTLER MENDELSON P.C.                    DANIEL W. SRSIC, ESQ.
  Counsel for Defendants Alcan and Novelis  KATHY J. SCADDEN, ESQ.
1100 Superior Avenue, 20TH Floor          NEAL B. WAINBLAT, ESQ.
Cleveland, OH 44114                       SUELLEN OSWALD, ESQ.

BOND SCHOENECK & KING PLLC                THOMAS G. ENRON, ESQ.
  Counsel for Defendants Alcan and Novelis
One Lincoln Center
Syracuse, NY 13202-1355

HON. GLENN T. SUDDABY, United States District Court Judge

## DECISION and ORDER

        This action was filed pursuant to the Employee Retirement Income Security Act of 1974

("ERISA"), 29 U.S.C. §§ 1001, *et seq*.  Generally, in his Amended Complaint, Richard Smith

("Plaintiff") alleges that Novelis Corporation, Alcan Aluminum Corporation,[1] Great West Life

and Annuity Insurance Company, Liberty Life Assurance Company of Boston, and Liberty

_____

        [1]        Novelis Corporation was formerly known Alcan Aluminum Corporation.  (*See*
Dkt. No. 43, at 2 n.2.)

Mutual revoked and terminated the Long Term Disability ("LTD") benefits to which he was entitled under the Novelis long-term disability plan (the "Plan") pursuant to 29 U.S.C. § 1132(a)(1)(B).  (*See generally* Dkt. No. 12 [Plf.'s Am. Compl.].)  Currently pending before the Court are Defendants' motion for summary judgment (Dkt. No. 42), and Plaintiff's cross-motion for summary judgment (Dkt. No. 50).  For the reasons set forth below, Plaintiff's motion is granted and Defendants' motion is denied.

# TABLE OF CONTENTS

I.    BACKGROUND...................................................................................................4

      A.    R e l e v a n t         P r o c e d u r a l
            History...................................................................................................4
      B.    Undisputed Material Facts.................................................................7
            1.    Plan Language..........................................................................7
            2.    Liberty Mutual's Review of Plaintiff's LTD Benefits.............9
                  a.    Dr. Carbone's Review of Plaintiff's Disability..........9
                  b.    The FCE..........................................................................10
                  c.    The Transferable Skills Analysis..............................12
                  d.    Dr. Saini's Response....................................................12
                  e.    The IME..........................................................................13
            3.    Liberty Mutual's Termination of Plaintiff's LTD Benefits....16
      C.    Summary of Grounds in Support of Defendants' Motion...............18
      D.    Summary of Grounds in Support of Plaintiff's Cross-Motion........19

II.   APPLICABLE LEGAL STANDARDS.........................................................20

      A.    Legal Standard Governing Motions for Summary Judgment.......20
      B.    Legal Standard Governing Plaintiff's Claim Under ERISA...........21
            1.    One Factor to Be Considered: Conflict of Interest.................23
            2.    Another Factor to Be Considered: Procedural Irregularities.........25

III.  ANALYSIS...........................................................................................................26

      A.    First Factor: Conflict of Interest.......................................................26
      B.    Second Factor: Procedural Irregularities.........................................26
      C.    Whether Defendants' Decision Was Without Substantial Evidence.................29
            1.    FCE..............................................................................................29
            2.    Dr. Saini's Statement................................................................31
            3.    The IME.......................................................................................32
            4.    Six-Week Pain Management Program in 1991.........................35
            5.    Subjective Complaints and Lack of Objective Evidence.........36
                  a.    Objective Evidence of Disability................................36
                  b.    Subjective Complaints.................................................38
            6.    Three Entry-Level Sedentary Jobs...........................................40
      D.    Conclusion..........................................................................................41
      E.    Remedy.................................................................................................42

# I.     BACKGROUND

## A.     Relevant Procedural History

On July 28, 2005, Plaintiff commenced this action.  (Dkt. No. 1.)  On October 13, 2005, he filed an Amended Complaint, which superceded his Complaint in all respects.  (Dkt. No. 12.)  *See* N.D.N.Y. L.R. 7.1(a)(4); *Rusyniak v. Gensini*, 07-CV-0279, 2009 WL 1269911, at *1 (N.D.N.Y. May 5, 2009) (Suddaby, J.).  Generally, the Amended Complaint asserts the following two causes of action: wrongful termination of benefits, and breach of fiduciary duty.  (Dkt. No. 12.)

On December 12, 2005, the parties filed a Joint Motion to Stay the Proceedings, requesting that the Court "remand Plaintiff's disability determination to the Plan Administrator to make findings consistent with the definition of 'totally disabled' from the September 1989 Summary Plan Description and the Plan Administrator discretionary standards set forth in the Summary Plan Description document entitled 'Important Information About Your Benefits,' effective January 1998[,] . . . and that such remand be completed consistent with the terms of the 'Important Information About Your Benefits' document, effective January 1998."  (Dkt. No. 19.)

On December 22, 2005, United States District Judge Gary L. Sharpe, of this District, issued an Order remanding the issue of Plaintiff's eligibility for LTD benefits to the Plan Administrator, and staying all proceedings in the matter until further order of the Court.  (Dkt. No. 20.)  In his Order, Judge Sharp stated that "the parties are required to provide the Court with a joint status report within 120 days from the date of the Order, and every 120 days thereafter, or to notify the Court of the result of the remand within 30 thirty days after administrative process [is] concluded, including (if applicable) after all administrative remedies are exhausted, whichever shall occur first."  (Dkt. No. 20.)

The parties complied with the Court's request, and provided the Court with Joint Status Reports over the next year.  (Dkt. Nos. 21, 23, 24.)  The final Joint Status Report stated as follows:

> Pursuant to the parties' joint status report of April 21, 2006, Plaintiff's claim file was returned to Liberty Mutual for professional review. On or about June 15, 2006, Liberty Mutual denied Plaintiff's appeal. On or about August 14, 2006, Plaintiff filed another administrative appeal to the Plan Administrator. Such appeal is pending.

(Dkt. No. 24.)

On January 9, 2007, the parties stipulated to a dismissal of Plaintiff's claims against Great West Life and Annuity Insurance Company without prejudice pursuant to Fed. R. Civ. P.  41.  (Dkt. No. 25.)  On January 10, 2007, Judge Sharpe issued an Order accepting the Joint Stipulation.  (Dkt. No. 26.)

On February 16, 2007, Plaintiff's attorney contacted the Court by letter, requesting that the Court restore the case to the calendar for further proceedings.  (Dkt. No. 27.)  In this letter, Plaintiff's attorney notified the Court that Novelis Corporation ("Novelis") contacted Plaintiff (through his attorney) on January 15, 2007, and notified him that the Novelis Employee Benefits Committee (the "Committee") had completed its administrative review of Plaintiff's claim for LTD benefits and upheld its denial of Plaintiff's claim.  (Dkt. No. 27.)  On February 22, 2007, Judge Sharpe ordered that the proceeding be restored to the calendar and that Defendants file and serve an Answer within thirty (30) days.  (Dkt. No. 28.)

On March 30, 2007, Novelis and Alcan Aluminum Corporation ("Defendants") filed an Answer to the Amended Complaint.[2]  (Dkt. No. 31.)  On April 30, 2008, the parties stipulated to

---

[2]     The docket reflects that Liberty Life Assurance Company of Boston and Liberty Mutual were never served in this action, which has been pending now for more than four (4) years.  Rule 4(m) of the Federal Rules of Civil Procedure states that "[i]f service of the summons

a dismissal of Plaintiff's Second Cause of Action for breach of fiduciary duty pursuant to Fed. R. Civ. P. 41.  (Dkt. No. 40.)  On that same day, Defendants filed a motion for summary judgment. (Dkt. No. 42.)  On May 1, 2008, Judge Sharpe issued an Order dismissing Plaintiff's Second Cause of Action for breach of fiduciary duty with prejudice, pursuant to Rule 41.  (Dkt. No. 46.) On May 19, 2008, Plaintiff filed a response to Defendants' motion and a cross-motion for summary judgment.  (Dkt. No. 50.)  On May 27, 2008, Defendants submitted a memorandum of law in reply to Plaintiff's response and in opposition to Plaintiff's cross-motion for summary judgment.  (Dkt. No. 57.)  On October 1, 2008, this case was reassigned to the undersigned. (Dkt. No. 60.)

As a result, currently pending before the Court are Defendants' motion for summary judgment and Plaintiff's cross-motion for summary judgment, both filed pursuant to Fed. R. Civ. P. 56.  (Dkt. Nos. 42 and 50.)

---

and complaint is not made upon a defendant within 120 days after the filing of the complaint, the court . . . shall dismiss the action without prejudice . . . or direct that service be effected within a specified time; provided that if the plaintiff shows good cause for the failure, the court shall extend the time for service for an appropriate period."  Because a district court must provide a plaintiff with notice that its action against the unserved Defendants will be dismissed before the Court may *sua sponte* dismiss the action, *see Chavis v. Zodlow*, 128 F. App'x 800, 802 (2d Cir. Apr. 12, 2005), Plaintiff is hereby notified that, unless he is able to demonstrate to the Court, within ten (10) days of this Decision, good cause for its failure to serve these two entities, the Court shall *sua sponte* dismiss them from the action.  Plaintiff is also notified that, for purposes of this Decision, Liberty Life Assurance Company of Boston and Liberty Mutual are not Defendants in this action.

### B.    Undisputed Material Facts[3]

### 1.    Plan Language

From 1988 to 2005, Alcan Aluminum Corporation had a long-term disability plan.  In 2005, Alcan Aluminum Corporation became Novelis Corporation.  From 2005 to the present, Novelis Corporation has had a long-term disability plan.  While the disability plan of Alcan Aluminum Corporation and Novelis Corporation has been amended since 1988 years, it has retained the following common features, among others.

The Plan provides disability benefits to employees who satisfy the definition of "disability" found in the Plan documents.  To qualify for long-term disability benefits, an employee must be "totally and continuously disabled for at least six full months," which is the "qualifying period."[4]  Under the Plan, an employee is "totally disabled" if that employee has "an illness or injury [that] prevents [him] from performing the essential duties of [his] job."

The above definition of "totally disabled" applies only during the qualifying period and the first 24 months of monthly payments.  After the initial 24-month period, the definition of "totally disabled" changes, whereby the employee "must be unable to perform the essential duties of any occupation anywhere for which [the employee is] suited based on [] education, training, experience, or for which [the employee] may become suited through a Rehabilitation Program."  To continue to qualify for long-term disability benefits, employees must submit proof

_____

[3]    Plaintiff does not challenge any of the material facts asserted by Defendants in their Rule 7.1 Statement, and does not assert any additional material facts in his Rule 7.1 Statement.  (*Compare* Dkt. No. 53 *with* Dkt. No. 43; *see also* Dkt. No. 50 [Plf's Mem. of Law noting that "the parties agree on the material substantive facts of the case."].)

[4]    Pursuant to their Joint Motion to Stay Proceedings, the parties have stipulated that the definition of "totally disabled" from the September 1989 summary plan description applies to this case.

of continuing disability.  Failure to show continued disability results in the termination of

benefits payments.

Under the terms of the benefits plan, the Sponsor of the Plan (originally Alcan Aluminum

Corporation and now Novelis Corporation) maintains a Benefits Committee that serves as the

Plan Administrator.  The Plan Administrator

> is in charge of the day-to-day operation of the Plans and for adopting
> and enforcing rules for Plan Administration. The . . . [Plan
> Administrator] has full discretion to interpret the terms of each plan
> (including administration, eligibility, receipt of benefits and all other
> policies), consistent with the terms of each Plan.

In 1988, the Plan Administrator was the Alcan Employee Benefits Committee.  In

2000, the Plan Administrator became Liberty Mutual Assurance Company of Boston

("Liberty Mutual").

The Plan advises participants, in pertinent part:

> In addition to establishing rights for Plan participants, ERISA imposes
> duties upon the people who are responsible for the operation of the
> Plan[].  The people who operate your Plan[], called 'fiduciaries,' have a
> duty to do so prudently and in the interest of all Plan participants and
> beneficiaries.

The parties have stipulated that the discretionary standards set forth in the 1998 plan

description apply to this case.  (*See* Dkt. No. 19 [stating that the Plan Administrator must "make

findings consistent with the definition of 'totally disabled' from the September 1989 Summary

Plan Description and the Plan Administrator discretionary standards set forth in the Summary

Plan Description document entitled 'Important Information About Your Benefits' document,

effective January 1998"].)

### 2.      Liberty Mutual's Review of Plaintiff's LTD Benefits

On July 18, 1988, Plaintiff filed a long-term disability claim based upon an impairment related to his back pain and herniated discs.  These benefits were allowed, and his long-term disability benefits began on January 14, 1989.

In September 2000, Liberty Mutual began administering Plaintiff's long-term disability benefits.  In December 2002, Liberty Mutual obtained an updated Physical Capacities Form and Restrictions Form for Plaintiff from Dr. Rajeen Saini, Plaintiff's primary care physician.  In reviewing those documents and the older medical evidence in the file, Liberty Mutual noted that there was only limited medical evidence in the file, and that the most recent diagnostic evidence, including a magnetic resonance imaging ("MRI") scan, was "from the early 1990s."

In 2003, a decision was made to do a "hypothetical" assessment of Plaintiff's transferable skills to determine if it would be cost effective to move forward with an independent medical examination ("IME").  Catherine Chandick, a Vocational Case Manager, determined that if, Plaintiff could perform "sedentary-light work," he would have unskilled, entry level occupations available to him.  In her report of November 17, 2003, Ms. Chandick found that Plaintiff could perform "unskilled entry level occupations" for which "no specific work experience is required," including positions like small parts assembler, cashier, security guard, and retail sales person, which positions paid wages similar to the wages Plaintiff was earning at the time of his injury.

### a.      Dr. Carbone's Review of Plaintiff's Disability

Liberty Mutual began a medical review of Plaintiff's condition in February 2004, by referring the matter to Dr. Angela Carbone, a consulting physician.  Dr. Carbone's report indicates that Plaintiff's medical records were "not conclusive in determining . . . chronic [lower

back pain]." Dr. Carbone also noted that Plaintiff's "limitations and restrictions [were] self reported," and found "no clinical documentation to support [the] restrictions and limitations." Dr. Carbone recommended that an IME and a functional capacity evaluation ("FCE") be performed, "in order to determine [Plaintiff's] current medical condition." Finally, Dr. Carbone noted that additional documentation from Dr. Saini would be helpful.[5] On March 10, 2004, Liberty Mutual requested Plaintiff's updated medical information from Dr. Saini.

### b.    The FCE

On March 15, 2004, in adherence to Dr. Carbone's recommendation, Plaintiff underwent an FCE. Cindy Bush, an Occupational Therapist Registered ("OTR"), performed the evaluation and prepared a detailed 17-page report documenting her findings. The report answered the following four questions:

> Question 1: Did Mr. Smith provide full physical effort during testing?
>
> Response: No, the test results suggest the presence of variable levels of physical effort on Mr. Smith's part. The motivation for which is unknown to this evaluator.
>
> Question 2: Are Mr. Smith's subjective reports reliable?
>
> Response: The correlation between his subjective pain reports and observed behavior was inconsistent at times.
>
> Question 3: What are Mr. Smith's physical limitations?
>
> Response: Mr. Smith's willingly demonstrated functional abilities fell within the physical demand level of Sedentary. His poor body mechanics limited his ability to perform manual material handling activities safely and successfully. The primary barriers to his return to competitive employment would be his high-perceived pain profile, unsafe body mechanics, and dependence on mobility aids such as a cane and electric scooter. He demonstrated limitations in forward

---

[5]    It appears that Dr. Carbone's report mistakenly refers to Dr. Saini as Dr. Faini.

bending, squatting, walking and standing.  He was able to perform these non-material handling activities on an occasional basis only with limited active range of motion.

Question 4: Are there any assistive/ergonomic aids that would significantly improve Mr. Smith's vocational ability?

Response: This therapist would recommend medical evaluation of the continued use of his worn lumbar support . . . which could be limiting rather than promoting function.  [Mr. Smith's] selection of the self-prescribed straight cane should be re-evaluated . . . [as] his gait pattern and habit of keeping his left leg straight could be a contributing problem as well.

The FCE report further noted as follows: (a) Plaintiff dressed and cared for himself, drove his own vehicle, helped his wife with housework to his ability, and helped his wife with her home-based gift shop business; (b) Plaintiff lived on a farm, enjoyed farm work including mowing his lawn and raising two baby calves; and (c) Plaintiff could "do more physically than [he] demonstrated during the testing day."  (In addition, the report suggested that any final vocation or rehabilitation decisions be "made with this [last finding] in mind.")

Based on Plaintiff's performance results and Bush's observations of Plaintiff throughout the evaluation period, Bush made the following recommendations: (1) "[d]ue to long history of absence from competitive employment, his high perceived pain profile, dependence on assistive aids for walking, . . . [Plaintiff] would be considered a highly guarded candidate for return to work"; (2) "[g]iven his stated desire to remain physically active as supported by his pursuit of potentially physically demanding hobbies, he could be [a] candidate for vocational retraining for sedentary, seated work"; and (3) "medical re-evaluation of ambulating aids and back brace [is recommended]."  (AR 180-196.)

11

### c.    The Transferable Skills Analysis

Following the FCE, Liberty Mutual sought out a Transferable Skills Analysis ("TSA")

report based upon the restrictions and limitations identified in the FCE.  In her report of June 2,

2004, Vocational Case Manager Laura Doherty found that, based on the FCE, Plaintiff's

"functional abilities fell within the physical demand level of sedentary."  Based on this finding,

as well as her finding that Plaintiff's skills from his prior work experience "would not transfer to

sedentary occupations," Ms. Doherty found that Plaintiff could perform "unskilled entry level

occupations" for which "no specific work experience is required," including positions like small

parts assembler, cashier, security guard, and retail sales person, which positions she determined

to pay wages similar to the wages Plaintiff had earned at the time of his injury.

### d.    Dr. Saini's Response

On June 23, 2004, Liberty Mutual enclosed the results of the FCE in a letter to Dr. Saini,

seeking his comments and specific disagreements with any parts of Ms. Bush's report.  Liberty

Mutual also sent a letter to Plaintiff updating him on the progress of his disability claim, as well

as information on Plaintiff's local vocational habilitation office.

Dr. Saini responded with a letter stating his agreement with Ms. Bush's report, but

indicating uncertainty about Plaintiff's ability to perform even a sedentary job:

> Mr. Smith has been disabled.  I did review the reports from his
> insurance company.  He definitely has significant tenderness of his
> lower back.  I do not think he can sit, stand, or walk for long periods.
> Even if he is sitting, he needs to change positions every 15-30 minutes.
> I do agree with the exam findings by Cindy Bush, but I am not sure if
> he can do a sedentary job as he would not be able to sit at a place for a
> long period of time.  He certainly cannot do any heavy lifting, pushing,
> pulling, kneeling, or crawling.  If further input is needed I do
> recommend referring him to an orthopedic surgeon so we can get a
> more detailed evaluation of what he can and cannot do.

Dr. Saini's reports were not consistent with the abilities Plaintiff described during the functional capacity exam, including the ability to lift 35-50 lbs, walk a half mile, and climb ladders. Dr. Saini recommended referring Plaintiff to an orthopedic surgeon for a "more detailed evaluation" of Plaintiff's ability, if further input was needed.

### e.    The IME

Liberty Mutual accepted Dr. Saini's recommendation and referred Plaintiff to Dr. Daniel Carr, an Orthopedic Surgeon, for an independent medical examination conducted on July 18, 2004. On October 27, 2004, Dr. Carr issued a report of his findings and conclusions stemming from the IME.

In the section of the report labeled "History of Present Illness," Dr. Carr noted that Plaintiff has had chronic back pain that has been disabling him since 1988, but that Plaintiff is also unable to clearly express his diagnosis. (AR 155.) More specifically, Dr. Carr indicated that Plaintiff "thinks it has something to do with L4-5 and his wife thought it might have something to do with degeneration, but they really do not know the[] diagnosis." (AR 155.) Dr. Carr further wrote that Plaintiff has been "treated with numerous physicians over the last 15 years," including "Dr. Razaq, an orthopedist who has since moved out of the area, . . . Dr. Yuan, an orthopedic spine surgeon . . . [who] apparently told [Plaintiff that] his condition was not bad enough to have surgery[,] . . . Dr. Mahon, another orthopedist[, and physicians] at the Boston Clinic." (AR 156.) Plaintiff has "had physical therapy, extensive chiropractic treatment, numerous medications, nerve blocks and worn a brace." (AR 156.) "None of this has given him any significant relief." (*Id.*)

Dr. Carr found that, currently, Plaintiff "just sees his primary care physician who provides pain medicine for him." (*Id*.) "He does not do anything else for treatment at the current time, other than pain medicine and activity modification." (*Id*.) "[S]ymptoms include low back pain in the left lower back that radiates into the left buttock and left groin . . . [, which] results in loss of motion and he has back spasms." (*Id*.) "The left buttock feels numb and the left leg will periodically give out." (*Id*.) "He uses a cane because of this giving out." (*Id*.) "All positions cause pain[,] and his pain is improved with positional changes, taking pain medicine and putting pillows between his legs and behind his back to prop up his body in bed." (*Id*.) "[H]is activity level at home is that he mows the lawn, but it takes him a long time to do it and he does have some miniature horses that he cares for." (*Id*.) Finally, Dr. Carr noted that Plaintiff takes Vicodin and Lotrel, and that he "states that he cannot work because he frequently falls down due to his back pain and leg giving out and also has to constantly change positions." (*Id*.)

Dr. Carr's findings and conclusions based on Plaintiff's physical examination were as follows: (1) he ambulated with a cane somewhat hunched over with a forward flexed posture; (2) he moved rather gingerly and asks for assistance when going from supine to seated; (3) he was able to get on and off the exam table on his own; (4) he could stand on his heels and stand on his toes; (5) his range of motion showed forward flexion to be within normal limits, but extension, lateral deviation and rotation were all moderately limited by pain; (6) his motor exam showed a non-physiologic give way weakness in all muscle groups in the left lower extremity; (7) his flip test was negative; (8) straightening and raising his leg gave him left groin pain at 20 degrees on the left side, and low back pain at 70 degrees on the right side; (9) he had equal thigh girth measurements, and his calf girth measurements showed the left calf to be half centimeter less

than the right; (10) he had no sensory deficit; (11) reflexes were symmetric and intact; and (12)

he had tenderness in the left buttock, but no other areas of tenderness and no spasm.  (AR 156-

157.)

Based on a review of Plaintiff's medical records, a discussion with Plaintiff and a

physical examination of Plaintiff, Dr. Carr provided an "Assessment" in his report, which stated

as follows: (1) "[Plaintiff is] a 44-year-old man with chronic low back pain and degenerative

lumbar disc disease at the 4-5 and 5-1 levels"; (2) "he has no objective findings on physical

exam, but his exam is full of subjective complaints"; (3) "he certainly has non-organic overly

and non-physiologic findings on exam"; (4) based on the available information, the patient is not

totally disabled[, but instead] he would have a mild partial disability based on imaging studies,

history and physical exam, and review of medical records"; (5) "in my opinion, he could return

to work and could work a job that did not involve repetitive twisting or bending at the waist and

had an overall lifting restriction of 30 pounds"; (6) "in my opinion, he requires no specific

ongoing treatment for his long-standing back problem, as there is nothing that is likely to

improve his condition"; (7) "he does not require any other conservative measures"; (8) "he does

not require any diagnostic testing for a back problem that is at least 16 years old"; (9) "he has

had some back pain all his life and he likely will be left with some back pain for the rest of his

life"; (10) "his diagnosis is not supported by objective findings other than the degenerative disc

disease on his imaging studies"; (11) "in my opinion, the patient could have returned to work in

a modified role long ago and certainly could be working at this point"; and (12) "[his] maximum

medical improvement was achieved long ago."  (AR 157-158.)

### 3.     Liberty Mutual's Termination of Plaintiff's LTD Benefits

On November 10, 2004, Liberty Mutual sent another letter enclosing Dr. Carr's report to Dr. Saini, and asking Dr. Saini to specifically state and support any disagreements with Dr. Carr's findings.  In a letter dated December 20, 2004, Liberty Mutual informed Plaintiff that his disability benefits were terminated effective December 30, 2004.

Liberty Mutual received a letter from Plaintiff on January 3, 2005, which sought to appeal the termination of his long term disability benefits, but provided no additional medical documentation.  On January 15, 2005, Liberty Mutual sent a letter informing Plaintiff of its decision to affirm the termination of his benefits.  On February 10, 2005, Plaintiff, by counsel, sent a letter to Mr. Scott Kermode, the manager of the Novelis health and welfare plans, to appeal the termination of Plaintiff's long-term disability benefits.  Subsequently, he followed up the letter with additional medical evidence.

On June 13, 2005, the Novelis Committee sent a letter to Plaintiff's counsel notifying him of their decision to uphold the termination of his benefits, and explaining that it found Plaintiff was not qualified for continued benefits based on the following information: (1) the FCE determination that Plaintiff was capable of performing sedentary work; (2) Dr. Saini's agreement with the FCE determination; and (3) the IME determination that Plaintiff was not totally disabled and was able to work at a job that did not require repetitive twisting or bending at the waist and had an overall lifting restriction of 30 pounds.  Following the remand from this Court, Plaintiff's counsel submitted additional evidence comprised of (1) a form entitled "Medical Opinion of Physical Residual Functional Capacity" dated March 2, 2006, and (2) Dr. Saini's treatment notes from May 8, 1997, to May 17, 2005.

16

On April 13, 2006, Liberty Mutual informed Plaintiff that it was unable to alter its decision to terminate his benefits.  The letter reviewed in detail the process involved in reaching the termination of benefits, and the rationale for, and supporting documents relied upon in reaching, the decision.

On June 14, 2006, Liberty Mutual sent additional correspondence to Plaintiff confirming its termination of his benefits.  On August 14, 2006, Plaintiff's counsel requested yet another appeal of the termination decision to the Committee, and stated that additional medical evidence was forthcoming.

On November 30, 2006, Plaintiff's counsel submitted Mr. Victor Albergi's vocational report as additional evidence to support Plaintiff's appeal.  On December 15, 2006, Mr. Kermode sent Mr. Albiergi's report to Liberty Mutual for its opinion as to whether the newly submitted evidence impacted the decision to terminate Plaintiff's disability benefits.

On January 3, 2007, Liberty Mutual provided its input.  A summary of the relevant issues was prepared and the Committee considered Plaintiff's appeal.  In a letter dated January 15, 2007, the Committee indicated in a letter to Plaintiff that their decision to terminate Plaintiff's LTD benefits was based on the following information: (1) the independent FCE performed by Cindy Bush, which indicated that Plaintiff is capable of sedentary work; (2) the statement by Plaintiff's treating physician, Dr. Saini, that he agrees with the exam findings done by Cindy Bush; (3) the IME performed by Dr. Carr and the subsequent report, which indicated that Plaintiff is not totally disabled and could therefore return to work at a job that did not involve repetitive twisting or bending at the waist and had an overall lifting restriction of thirty pounds; (4) the fact that, although Plaintiff's treating physician in 1991 referred Plaintiff to a six-week

pain management program, there was no evidence that Plaintiff followed this treatment recommendation or pursued any subsequent rehabilitation effort; (5) the fact that, based on a review of Plaintiff's entire claim record, it appeared that his claim of disability rested almost entirely on self-reported back pain given that there appears to be little or no evidence of objective clinical findings in the various reports to support Plaintiff's subjective complaints;[6] and (6) the fact that Liberty Mutual identified three entry-level sedentary occupations that Plaintiff was reasonably capable of performing.  (AR 1022-1023.)

### C.    Summary of Grounds in Support of Defendants' Motion

On April 30, 2008, Defendants moved for summary judgment pursuant to Fed. R. Civ. P. 56.  (Dkt. No. 42.)  In support of their motion, Defendants argue that the Plan Administrator's decision to terminate Plaintiff's LTD benefits was not arbitrary and capricious, but was based on such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the Plan Administrator (i.e., it was supported by "substantial evidence").  (Dkt. No. 42, Part 1, at 13-16.)  In making this argument, Defendants argue that the Plan Administrator was not required to give special weight or deference to the opinions of Plaintiff's treating physician (Dr. Saini) in reaching its determination (and that, even if the Plan Administrator was required to give such deference, the opinions of Plaintiff's treating physician would not be sufficient to overcome the overwhelming evidence acquired by the Plan Administrator in the review process).  (*Id*. at 16-18.)

---

[6]        In addition, Defendants stated that "we question the significance of the MRI and CT exams conducted in 1991.  While these exams apparently revealed evidence of some degree of degenerative disk [sic] disease, there does not appear to be corroborating objective clinical findings in the medical records provided at that time to indicate that [Plaintiff] suffered from specific neurological deficits or functional limitations as a result of disk [sic] disease."  (AR 1022-1023.)

### D.      Summary of Grounds in Support of Plaintiff's Cross-Motion

On May 19, 2008, Plaintiff cross-moved for summary judgment pursuant to Fed. R. Civ.

P. 56.  (Dkt. No. 50.)  In support of his cross-motion, Plaintiff argues that the Plan

Administrator's decision to terminate his LTD benefits was arbitrary and capricious, because a

reasonable mind could not accept as adequate to support the conclusion reached by the Plan

Administrator (i.e., it was not supported by "substantial evidence").  (*Id*. at 11-15.)  In particular,

Plaintiff argues that, after finding him disabled in 1989 and extending him LTD benefits for 15

years (upon receipt of satisfactory medical proof of his continuing disability), the Plan

Administrator (upon being taken over by Liberty Mutual) took the following course of action in

order to declare him not disabled: (1) it *sua sponte* reopened Plaintiff's file and re-evaluated its

underlying 1989 decision to extend him LTD benefits; (2) it subjected him to heightened

scrutiny (including an examination by an occupational therapist, Ms. Bush, and a physician, Dr.

Carr); (3) it completely ignored the opinion of Plaintiff's treating physician (Dr. Saini); (4) it

completely ignored the opinion of Plaintiff's vocational counselor (Mr. Alberigi); and (5) it

relied on vocational evidence provided by a vocational counselor (Ms. Doherty) that was faulty

in that incorrectly classified three occupations (which Plaintiff could assertedly perform) as

"sedentary" and "unskilled."  (*Id*. at 12-14.)

In response, Defendants argue that the administrative record contains an abundance of

evidence supporting the Plan Administrator's decision.  (Dkt. No. 57, at 2.)  In so arguing,

Defendants repeat their original argument that Plaintiff is improperly attempting to have the

opinion of his treating physician (Dr. Saini) afforded special weight or deference.  (*Id*. at 2-5.)

Similarly, Defendants essentially argue that Plaintiff is improperly attempting to have the

opinion of his vocational counselor (Mr. Alberigi) afforded special weight or deference.  (*Id*. at

5-6.)

## II.     APPLICABLE LEGAL STANDARDS

### A.     Legal Standard Governing Motions for Summary Judgment[7]

Under Fed. R. Civ. P. 56, summary judgment is warranted if "the pleadings, the

discovery and disclosure materials on file, and any affidavits show that there is no genuine issue

as to any material fact and that the moving party is entitled to a judgment as a matter of law."

Fed. R. Civ. P. 56(c).  In determining whether a genuine issue of material fact exists, the Court

must resolve all ambiguities and draw all reasonable inferences against the moving party.

*Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 255 (1986).  In addition, "[the moving party]

bears the initial responsibility of informing the district court of the basis for its motion, and

identifying those portions of the . . . [record] which it believes demonstrate[s] the absence of any

genuine issue of material fact." *Celotex v. Catrett*, 477 U.S. 317, 323-24 (1986).  However, when

the moving party has met this initial responsibility, the nonmoving party must come forward

with "specific facts showing a genuine issue [of material fact] for trial."  Fed. R. Civ. P. 56(e)(2).

A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury

could return a verdict for the novmoving party."  *Anderson*, 477 U.S. at 248.  As a result,

"[c]onclusory allegations, conjecture and speculation . . . are insufficient to create a genuine

issue of fact."  *Kerzer v. Kingly Mfg*., 156 F.3d 396, 400 (2d Cir. 1998) [citation omitted]; *see*

*also* Fed. R. Civ. P. 56(e)(2).  As the Supreme Court has famously explained, "[the nonmoving

party] must do more than simply show that there is some metaphysical doubt as to the material

facts." [citations omitted].  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp*., 475 U.S.

---

[7]      Both parties assert that the Court may decide this proceeding as a matter of law because the parties agree on the material substantive facts of the case.  (Dkt. No. 50, at 16; *see also* Dkt. No. 57, at 2-3.)

574, 585-86 (1986).

As for the materiality requirement, a dispute of fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* [citation omitted].

"It is appropriate to consider a challenge under ERISA to the denial of disability benefits as a summary judgment motion reviewing the administrative record." *Suarato v. Building Services 32BJ Pension Fund*, 554 F. Supp.2d 399, 414-15 (S.D.N.Y. 2008) (citing *Muller v. First Unum Life Ins. Co.*, 341 F.3d 119, 124 [2d Cir. 2003]); *see also Gannon v. Aetna Life Ins. Co.*, 05-CV-2160, 2007 WL 2844869, at *6 (S.D.N.Y. Sept. 27, 2007) ("[S]ummary judgment provides an appropriate vehicle whereby the Court can apply substantive ERISA law to the administrative record."); *Chitoiu v. UNUM Provident Corp.*, 05-CV-8119, 2007 WL 1988406, at *3 (S.D.N.Y. July 6, 2007); *Perezaj v. Bldg. Serv. 32B-J Pension Fund*, 04-CV-3768, 2005 WL 1993392, at *4 (E.D.N.Y. Aug. 17, 2005) ("A court evaluating a fund's final decision under the arbitrary and capricious standard should therefore grant summary judgment to the fund where there is no genuine dispute regarding whether the decision was arbitrary and capricious.").

### B.   Legal Standard Governing Plaintiff's Claim Under ERISA

"ERISA does not set out the appropriate standard of review for actions under § 1132(a)(1)(B) challenging benefit eligibility determinations." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 109 (1989). Rather, the Supreme Court has explained "that a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the [plan] administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co.*, 489 U.S. at 115.

21

"[W]here the ERISA plan confers upon the plan administrator discretionary authority to 'construe the terms of the plan,' the district court should review a decision by the plan administrator under an excess of allowable discretion standard." *Frommert v. Conkright*, 535 F.3d 111, 119 (2d Cir. 2008) (citing *Nicols v. Prudential Ins. Co. of America*, 406 F.3d 98, 108 (2d Cir. 2005) [noting that the proper standard when a Plan vests the administrator with discretionary authority is "abuse of discretion."]).  Under such a standard, an administrator abuses its discretion only when the administrator's actions are arbitrary and capricious.  *See, e.g., Guglielmi v. Northwestern Mut. Life Ins. Co.*, 06-CV-3431, 2007 WL 1975480, at *4 (S.D.N.Y. July 6, 2007) (quoting *Firestone Tire & Rubber Co.*, 489 U.S. 101, 115 [1989]).   Because this is a "highly deferential standard of review, an administrator's decision should only be disturbed if it is without reason, unsupported by substantial evidence or erroneous as a matter of law, considering the relevant factors of the decision." *Guglielmi*, 2007 WL 1975480, at *4 (citations and internal quotations omitted).[8]  A district court must look to the administrative record as a whole in deciding whether the plan administrator's decision was without reason, unsupported by substantial evidence or erroneous as a matter of law.  *See, e.g., Cohen v. Metropolitan Life Ins. Co.*, 485 F. Supp.2d 339, 354 (S.D.N.Y. 2007) ("consider[ing] MetLife's entire administrative record" and "determin[ing] as a matter of law that MetLife's invocation of the exclusion was arbitrary and capricious"); *Gropper v. Conseco Service, LLC*, 04-CV-5820, 2005 WL 2000089, at *4 (S.D.N.Y. Aug. 18, 2005) ("After considering the entire administrative record, the Court concludes that Plaintiff was disabled, as defined by the Defendant's plan, at the time that her

---

[8]    "Substantial evidence consists of such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the [administrator and] . . . requires more than a scintilla but less than a preponderance." *Guglielmi*, 2007 WL 1975480, at *4 (citation and internal quotations omitted).

claim for benefits was denied."); *Cook v. Liberty Life Assur. Co. of Boston*, 320 F.3d 11, 19 (1st Cir. 2003) (citing *Mitchell v. Eastman Kodak Co.*, 113 F.3d 433, 440 [3d Cir. 1997]).

Here, Plaintiff concedes that, pursuant to *Firestone Tire & Rubber Co.*, the proper standard of review in this case is whether the Plan Administrator's decision was arbitrary and capricious.  (Dkt. No. 50, at 16.)  In addition, Plaintiff acknowledges that Defendants are provided with discretionary authority under the Plan.  (Dkt. No. 50, at 16.)

### 1.        One Factor to Be Considered: Conflict of Interest

As stated above in Part II.B. of this Decision and Order, a deferential standard of review is appropriate where the plan grants the administrator discretionary authority to determine eligibility benefits.  However, in the aftermath of *Metropolitan Life Insurance Co. v. Glenn*, 128 S. Ct. 2343 (2008), "a plan under which an administrator both evaluates and pays benefits claims creates the kind of conflict of interest that courts must take into account and weigh as a factor in determining whether there was an abuse of discretion, but does not make *de novo* review appropriate."  *McCauley v. First Unum Life Ins. Co.*, 551 F.3d 126, 132-33 (2d Cir. 2008) (citing *Glenn*, 128 S. Ct. at 2348).  "This is true even where the plaintiff shows that the conflict of interest affected the choice of a reasonable interpretation."  *McCauley*, 551 F.3d at 133 (citing *Glenn*, 128 S. Ct. at 2348).  In addition, "for ERISA purposes," the rule is no different "where the plan administrator is not the employer itself but rather a professional insurance company." *Glenn*, 128 S. Ct. at 2349-50.

"[W]hen judges review the lawfulness of benefit denials, they [should] take account of several different considerations of which a conflict of interest is one." *Glenn*, 128 S. Ct at 2351. In instances where there are multiple factors for a court to consider, "any one factor will act as a tiebreaker when the other factors are closely balanced, the degree of closeness necessary

depending upon the tiebreaking factor's inherent or case-specific importance." *Id.* Under this "combination-of-factors method of review," *see Glenn*, 128 S. Ct. at 2351, "[t]he weight given to the existence of the conflict of interest will change according to the evidence presented." *McCauley*, 551 F.3d at 133.

For example, "[t]he conflict of interest . . . should prove more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision, including, but not limited to, cases where an insurance company administrator has a history of biased claims administration." *Glenn*, 128 S. Ct at 2351. "It should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy, for example, by walling off claims administrators from those interested in firm finances, or by imposing management checks that penalize inaccurate decisionmaking irrespective of whom the inaccuracy benefits." *Id.* (citations omitted).

In addition to the well-recognized "structural conflict" that exists where the administrator both evaluates and pays benefits claims, courts in various circuits have recognized other types of conflicts that may also be taken into account and weigh as a factor in determining whether there was an abuse of discretion. *See, e.g., Harrison v. Prudential Ins. Co. of America*, 543 F. Supp.2d 411, 421-22 (E.D. Pa. 2008) ("A conflict also exists and a 'more searching scrutiny' is required where the impartiality of the administrator is called into question. This potential for prejudice can arise either because the structure of the plan itself inherently creates a conflict of interest, or because the beneficiary has put forth specific evidence of bias or bad faith in his or her particular case.") (internal quotation marks and citations omitted).

### 2.    Another Factor to Be Considered: Procedural Irregularities

Procedural irregularities in the administrative process constitute factors that should also be taken into consideration in determinating whether a plan administrator abused its discretion in denying a claimants claim for benefits under the ERISA plan. *Glenn*, 128 S. Ct. at 2351-52; *McCauley*, 551 F.3d at 134-36; *Leu*, 2009 WL 2219288, at *3. Examples of procedural irregularities include the following actions of the plan administrator: (1) "encourag[ing] [the claimant] to argue to the Social Security Administration that she could do no work . . . , and then ignor[ing] the agency's finding in concluding that [the claimant] could in fact do sedentary work";[9] (2) "emphasiz[ing] a certain medical report that favor[s] a denial of benefits, [and] . . . deemphasiz[ing] certain other reports that suggest[] a contrary conclusion";[10] (3) "fail[ing] to provide its independent vocational and medical experts with all of the relevant evidence";[11] (4) "revers[ing] its initial decision to award benefits despite not receiving any new medical information";[12] (4) "rel[ying] on the opinions of its own non-treating physicians over the opinions of [p]laintiff's treating physicians" when deciding to reverse a prior award;[13] (6) terminating plaintiff's claims after a lengthy period of time (e.g., "approximately ten years") despite the administrator's physician having difficulty "identify[ing] specific improvements in

---

[9]      *See Glenn*, 128 S. Ct. at 2351-52.

[10]      *Id*.

[11]      *Id*.

[12]      *Harrison v. Prudential Ins. Co. of Am.*, 543 F. Supp.2d 411, 421-22 (E.D. Pa. 2008) (internal quotation marks and citations omitted).

[13]      *Harrison*, 543 F. Supp.2d at 421-22 (internal quotation marks and citations omitted).

[p]laintiff's condition";[14] and (7) failing to obtain a concise opinion from its physician as to whether plaintiff is able to work without accommodations despite reversing a ten-year decision, which found that plaintiff was unable to work.[15]

## III.   ANALYSIS

Because the parties have stipulated to a dismissal of Plaintiff's breach of fiduciary duty claim, the only issue before the Court is whether Defendants wrongfully terminated Plaintiff's benefits under the Plan.  More specifically, the issue is whether the Plan Administrator's decision to terminate Plaintiff's LTD benefits was arbitrary and capricious.

### A.   First Factor: Conflict of Interest

As an initial matter, Defendants both evaluate and pay benefits claims under the Plan (and the record is not clear as to what steps Defendants have taken to reduce potential bias and to promote accuracy).  Thus, a conflict of interest exists.

As a result, the Court finds that this factor weighs in favor of finding that Defendants' decision amounted to an abuse of discretion.

### B.   Second Factor: Procedural Irregularities

The record contains evidence of the following facts indicating the existence of procedural irregularities: (1) although Defendants assisted Plaintiff in obtaining Social Security disability benefits, Defendants gave little or no weight to a Social Security finding of disability; (2) Defendants emphasized the medical report of its IME over the medical reports of seven different doctors, who each concluded that Plaintiff suffers from Degenerative Disc Disease; (3)

---

[14]      *Taylor v. SmithKline Beecham Corp.*, 07-CV-0809, 2009 WL 1833876, at *8 (C.D. Cal. June 26, 2009).

[15]      *SmithKline Beecham Corp.*, 2009 WL 1833876, at *8.

Defendants took issue with objective examinations conducted prior to Defendant re-opening Plaintiff's file, yet Defendants has failed to request that Plaintiff undergo new objective examinations; and (4) Defendants *sua sponte* reversed its decision to award benefits after approximately thirteen years despite Defendants' IME recognizing that Plaintiff's condition has not changed, as "maximum medical improvement was achieved long ago."

With regard to this last irregularity, several Courts–including the Second Circuit–faced with the issue of a plan administrator attempting to terminate a claimant's benefits after a period of time has passed (in which the claimant has received benefits under the relevant plan) have found that "[d]ecisions to terminate benefits in the absence of a change in condition . . . [are] arbitrary and capricious."  *Rappa v. Conn. Gen. Life Ins. Co.*, 06-CV-2285, 2007 WL 4373949, at *10 (E.D.N.Y. Dec. 11, 2007); *see, e.g., Connors v. Conn. Gen. Life Ins. Co.*, 272 F.3d 127, 136 (2nd Cir. 2001) (reversing termination for three reasons, which included the fact that there was no significant change in claimant's physical condition and claimant had been provided disability benefits for almost thirty months under the stringent "any occupation" definition of disability); *Cook v. Liberty Life Ass. Co. of Boston*, 320 F.3d 11, 23 (1st Cir. 2003) (reversing termination where claimant provided the same type of evidence she had always provided to show disability under "any occupation" definition); *McOsker v. Paul Revere Life Ins. Co.*, 279 F.3d 586, 589 (8th Cir. 2002) ("[U]nless information available to an insurer alters in some significant way, the previous payment of benefits is a circumstance that must weigh against the propriety of an insurer's decision to discontinue those payments."); *Walke v. Group Long Term Disability Ins.*, 256 F.3d 835, 840 (8th Cir. 2001) ("Nothing in the claims record justified [the administrator's] decision that a change of circumstances warranted termination of the benefits it

initially granted.").[16]

The Court finds merit to the conclusion that, when there has been no change in the relevant plan or policy, under which Plaintiff was deemed "totally disabled" for more than a decade based on objective and subjective medical evidence, and when there has been no change in Plaintiff's condition,[17] any effort to *sua sponte* re-open Plaintiff's file and consider terminating his benefits based on the exact same evidence and standard as before smacks of arbitrary conduct.  Furthermore, allowing a plan administrator to then credit the opinion of a newly hired "independent physician" over a treating physician would appear to invite physician-shopping, a temptation that should be avoided by a fiduciary such as a plan administrator.

Having said that, this Court is not prepared to find, in this case, that this conduct alone is grounds for finding that Defendants' ultimate decision to terminate Plaintiff's benefits was arbitrary and capricious.  As a result, the Court finds only that these procedural irregularities

---

[16]     *Cf. Ellis v. Liberty Life Assur. Co. of Boston*, 394 F.3d 262, 274 (5th Cir. 2004) (holding that "when a plan fiduciary initially determines that a covered employee is eligible for benefits and later determines that the employee is not, or has ceased to be, eligible for those benefits by virtue of additional medical information received, the plan fiduciary is not required to obtain proof that a *substantial change* in the LTD recipient's medical condition occurred after the initial determination of eligibility.  Indeed, evidence could exist-as it did here-at the time that the plan fiduciary initially granted benefits that demonstrates that the ERISA plaintiff is not totally disabled.") (emphasis added); *Bregman v. Hartford Life and Acc. Ins. Co.*, 04-CV-1657, 2008 WL 4371927, at *9 (D. Conn. Sept. 23, 2008) ("If benefits are terminated absent any change in the participant's medical condition, or the applicable policy language, the previous decision to award benefits is relevant in evaluating the reasonableness of terminating benefits[,] . . . [but if the] parties dispute whether [plaintiff's] physical condition [has] changed . . . [the] previous classification is . . . relevant evidence, but is not conclusive in determining whether [plaintiff] remained totally disabled.").

[17]     The Court will discuss this issue in further detail below.  At this point, the Court will note only that the IME arranged for by Defendants resulted in a finding that Plaintiff's condition is unlikely to improve because "maximum medical improvement was achieved long ago."  (AR 158.)

weigh (albeit strongly) in favor of finding that Defendants' decision amounted to an abuse of discretion.

**C.      Whether Defendants' Decision Was Without Substantial Evidence**

As explained above in Part I.B.3 of this Decision and Order, on January 15, 2007, Defendants indicated in a letter (the "denial letter") to Plaintiff that the decision to terminate Plaintiff's LTD benefits was based on six pieces of information.  Defendants argue that these six pieces of information constitute *substantial evidence* supporting their decision to terminate Plaintiff's benefits.  The Court will now discuss those six pieces of information in detail.[18]

**1.      FCE**

As explained above in Part I.B.2.b. of this Decision and Order, in her FCE report, Cindy Bush made three recommendations based on performance results and observations of Plaintiff throughout the March 15, 2004, evaluation.  (AR 180-196.)

Defendants attempt to highlight Bush's opinions with regard to Plaintiff's effort during the evaluation and the reliability of his subjective reports of pain.  However, the Court finds that these opinions are not reliable for three reasons: (1) Bush failed to elaborate on these conclusions, or offer any explanation as to why she drew these conclusions;[19] (2) she also stated

---

[18]      For the sake of brevity, the Court will not discuss in detail the numerous pieces of record evidence that weigh against Defendants' decision to terminate Plaintiff's benefits, but that Defendants' neglected to consider.  For example, the report of Plaintiff's vocational counselor Victor Alberigi, which was issued while Plaintiff's case was on appeal before the Committee, included (1) a statement by Plaintiff to Mr. Alberigi that he has difficulty getting out of bed 4-5 days a month, and (2) a statement by Plaintiff that he sometimes has to rest after he sits or stands for about twenty minutes due to the pain.  (AR 966.)

[19]      Bush also stated in her FCE report that "Mr. Smith can do more physically at times than was demonstrated during this testing day[, and] [a]ny final vocational or rehabilitation decisions for Mr. Smith should be made with this in mind."  (AR 181.)  However, in reaching this conclusion, Bush fails to indicate the basis for this conclusion, or how much more Mr. Smith

that "overall, inconsistencies were considered minor, with [Plaintiff's] subjective reports generally matching well with distraction-based clinical observations"; and (3) Plaintiff did not complain of inappropriate pain during any of the placebo pain tests.  (AR 181, 195.)

In addition, the Court finds a number of other inconsistencies in the report, which render the FCE suspect and an insufficient basis on which to terminate Plaintiff's benefits (either alone or together with the other record evidence in this case).  First, Bush categorizes the following as Plaintiff's "hobbies," which are "physically demanding": (1) mowing the lawn; (2) climbing stairs; (3) climbing a ladder; (4) caring for livestock; (5) walking; and (6) driving a car.

Assuming that these are all physically demanding hobbies, a closer look at Plaintiff's statements and the test results during the evaluation reveals the following: (1) he mows the lawn with a riding lawn mower, and has to stop and get out at times because of the vibration; (2) getting up stairs "takes [him] a while," and "is a little difficult, but [he] can do it"; (3) climbing ladders is something that "is very hard for [him] to do" because he gets "afraid on ladders because [he] never know[s] when [his] left hip will give out"; (4) caring for livestock consists of bottle-feeding calves; (5) Plaintiff is not able to walk much beyond a half mile at once, and has to stop and rest before he can walk back; and (6) he can drive, but "[b]ending is very difficult," and he is able to sit for less than twenty minutes at a time.  (AR 186, 187, 191.)  As a result, the Court finds that it would not be rational to conclude that Plaintiff's ability to engage in the above-referenced "hobbies" means that he is capable of performing sedentary work.[20]

---

can physically do.  In addition, this statement could also be interpreted as meaning that Plaintiff is able to more on some days than others, which contradicts a finding that he is capable of returning to a regimented work schedule in a sedentary capacity.

[20]    The United States Department of Labor defines "sedentary work" as the least demanding form of work.  *See Tholke v. Unisys Corp.*, 96 F. App'x 762, 764 n.4 (2d Cir. May 5,

Second, Bush's conclusion that Plaintiff's "willingly demonstrated functional abilities fell within the physical demand level of Sedentary" is, at a minimum, confusing, given her own observations that (1) Plaintiff "demonstrated limitations in forward bending, squatting, walking and standing," because "[h]e was able to perform these non-material handling activities on an occasional basis only with limited active range of motion," (2) Plaintiff is unable to stand or sit for longer than 24 minutes at a time, (3) Plaintiff has a high perceived pain profile, and (4) Plaintiff has been out of work for 15 years.  (AR 181-182, 191.)  In addition, Bush's conclusion fails to consider (1) Plaintiff's "unsafe body mechanics" and reliance on a mobility aid, (2) his dependency on prescribed pain medication, (3) his ability to get to and from work every day, (4) Plaintiff's need for "daily naps," and (5) his statement that "[s]ometimes [crawling] is how I get to where I have to go."  (AR 181, 182, 185, 187, 189.)

For all of these reasons, the Court finds that Bush's opinion that Plaintiff's functional abilities render him capable of performing sedentary work is not a sufficient ground (either alone or together with the other record evidence in this case) upon which to terminate Plaintiff's LTD benefits.

### 2.  Dr. Saini's Statement

As stated above in Part I.B.2.d. of this Decision and Order, in response to the FCE, Dr. Saini sent Liberty Mutual a letter, in which he stated his agreement with the exam findings by Ms. Bush, but also expressed uncertainty about Plaintiff's ability to perform even a sedentary

_____

2004).  The United States Department of Labor defines "sedentary work" as follows: "Lifting 10 lbs. maximum and occasionally lifting and/or carrying such articles as dockets, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required only occasionally and other sedentary criteria are met."  *See Tholke*, 96 F. App'x at 764 n.4.

job. Defendants cite Dr. Saini's agreement with the exam findings of Cindy Bush as a reason for terminating Plaintiff's benefits.

The Court finds that, when read in its entirety, although Dr. Saini's statement agrees with Cindy Bush's exam findings, it disagrees with Cindy Bush's ultimate conclusion about Plaintiff's ability to perform sedentary work.

For all of these reasons, the Court finds that the referenced portions of Dr. Saini's letter are not a sufficient ground (either alone or together with the other record evidence in this case) upon which to terminate Plaintiff's LTD benefits.

### 3.      The IME

As stated above in Part I.B.2.e. of this Decision and Order, in response to Dr. Saini's recommendation, Liberty Mutual referred Plaintiff to Dr. Carr for an IME (which was conducted on July 18, 2004).  On October 27, 2004, Dr. Carr issued a written report, detailing his findings and conclusions based on both his personal examination of Plaintiff, and a review of Plaintiff's medical records.

After carefully considering the findings and conclusions set forth in Dr. Carr's report, the Court finds that Dr. Carr's ultimate conclusions are flawed for five reasons.  First, Dr. Carr concluded that Plaintiff "ha[d] no objective findings on physical exam."[21]  However, Dr. Carr indicated that the "motor exam show[ed] a non-physiologic give way weakness in all muscle groups in the left lower extremity," and that Plaintiff "ha[d] tenderness in the left buttock."  Certainly these are objective findings.  Moreover, it is unclear to the Court what sort of additional objective evidence–other than an MRI, X-Ray or other objective test–would reveal the disabilities with which Plaintiff has been diagnosed.

---

[21]      The Court will assume that this statement refers to objective evidence of a disability.

Second, Dr. Carr concluded that Plaintiff's "diagnosis is not supported by objective findings other than the degenerative disc disease on his imaging studies."  Despite this conclusion, Dr. Carr noted in his report that Dr. Saini diagnosed Plaintiff with "chronic low back pain," Dr. Yuan diagnosed Plaintiff with degenerative disc disease and a lesion, and Dr. Rosenbaum gave his opinion that Plaintiff suffers from a lateral herniated disc at the "4-5 level." In addition, Dr. Razaq diagnosed Plaintiff with lumbar L4-5 degenerative disc disease, and Dr. Fagen diagnosed Plaintiff with degenerative disc disease.  Furthermore, Dr. Carr stated in his "Assessment" that Plaintiff has chronic low back pain and degenerative lumbar disc disease at the 4-5 and 5-1 levels.  From what the Court can gather, this conclusion is consistent with the diagnoses provided by all of the other physicians whom Plaintiff has seen, and the accompanying objective testing performed by some of these physicians.  Thus, the Court is uncertain what "diagnosis is not supported by objective findings."

Third, Dr. Carr concluded that, "based on the available information, the patient is not "totally disabled," but instead has "a mild partial disability based on imaging studies, history and physical exam, and review of medical records."  However, the medical records offered by at least two physicians (Dr. Saini and Dr. Razaq) include opinions that, based on Plaintiff's pain and disease, he is totally disabled.  Moreover, Dr. Carr does not provide a more specific statement that would enable a factfinder to discern how he, in his mind, defines "mild partial disability."  For example, does this mean that Plaintiff is capable of working, but not full time, or does this mean that Plaintiff is capable of working full time, performing "light work"?[22]

---

[22]    The United States Department of Labor defines "light work" as follows: "Lifting 20 lbs. maximum with frequent lifting and/or carrying objects weighing up to 10 lbs. Even though the weight lifted may be only a negligible amount, a job is in this category when it involves sitting most of the time with a degree of pushing and pulling of arm and/or leg controls, or when it requires walking or standing to a significant degree." *See Tholke*, 96 F. App'x at 764 n.4.

Fourth, Dr. Carr conceded that (1) Plaintiff's condition "is not likely to improve," (2) treatment will not help him, and (3) he has suffered back problems for at least 16 years. Nonetheless, Dr. Carr concluded that Plaintiff "could have returned to work in a modified role long ago."  Such a conclusion contradicts the opinions of two treating physicians, as well as the opinion of the Novelis Plan Administrator, who, as recently as 2000, determined that Plaintiff was not capable of working.  Furthermore, as with Dr. Carr's "mild partial disability" statement, because Dr. Carr does not define what he means by "modified role," it is impossible for a factfinder to discern in what capacity he believes Plaintiff is capable of working.  Finally, this conclusion either overlooks or attempts to minimize the significance of Dr. Carr's earlier notations that Plaintiff's "[c]urrent symptoms include low back pain in the left lower back that radiates into the left buttock and left groin . . . [, which] results in loss of motion, . . . back spasms[,]" and sometimes causes "the left leg . . . [to] give out." (AR 156.)

Fifth, Dr. Carr stated that, in his opinion, Plaintiff "could return to work and could work a job that did not involve repetitive twisting or bending at the waist and had an overall lifting restriction of 30 pounds."  This conclusion suggests that Plaintiff is capable of performing work beyond the sedentary level, and is curious given not only the opinions of the treating physicians and the Novelis Plan Administrator but also the opinion of Cindy Bush, who concluded that Plaintiff's "willingly demonstrated functional abilities fell within the physical demand level of Sedentary."  Moreover, given that Dr. Carr did not indicate in his report that he had Plaintiff perform lifting exercises, the Court can only conclude, based on Dr. Carr's review of Plaintiff's FCE, that Dr. Carr is basing his conclusion that Plaintiff is able to lift up to 30 pounds on Plaintiff's statement to Cindy Bush that he can lift between 35 and 50 pounds.  (*See* AR 186.) However, this statement is problematic because it is without context.  Specifically, it is not clear whether Plaintiff is asserting that he can lift 35 to 50 pounds once a day, once a week, once an

hour, or once a minute.  Furthermore, Cindy Bush did not witness Plaintiff lift this weight to determine how high, how far, and/or how effectively Plaintiff is able to move this weight. Therefore, to draw a conclusion that Plaintiff could work in a job where he regularly lifts 25 pounds based solely on Plaintiff's statement appears arbitrary.

For all of these reasons, the Court finds that Dr. Carr's opinion that Plaintiff is not totally disabled (as well as his other findings and conclusions) do not provide a sufficient ground (either alone or together with the other record evidence in this case) upon which to terminate Plaintiff's LTD benefits.

### 4.      Six-Week Pain Management Program in 1991

In further support of their decision to terminate Plaintiff's benefits, Defendants indicated in their termination letter that, in 1991, Plaintiff's treating physician referred him to a six-week pain management program, and there is no evidence that Plaintiff followed this treatment recommendation or pursued any subsequent rehabilitation effort.

In 1991, Plaintiff was receiving LTD benefits.  Plaintiff continued to receive these benefits until 2004.  If Plaintiff's failure to attend a six-week pain management program was a sufficient reason for terminating Plaintiff's benefits, it is unclear why Plaintiff continued to receive benefits for another thirteen years.  Moreover, as eluded to by Dr. Fagen prior to 1991, and as indicated by Dr. Carr, there is no treatment that is likely to improve Plaintiff's condition because Plaintiff's "maximum medical improvement was achieved long ago."

For all of these reasons, the Court finds that Plaintiff's failure to attend the six-week pain management program in 1991 does not provide a sufficient ground (either alone or together with the other record evidence in this case) upon which to terminate Plaintiff's LTD benefits.

### 5.    Subjective Complaints and Lack of Objective Evidence

In further support of their decision to terminate Plaintiff's benefits, Defendants indicated in their termination letter that Plaintiff's claim of disability rests almost entirely on self-reported back pain, and there appears to be little or no evidence of objective clinical findings in the various reports to support Plaintiff's subjective complaints.  Defendants then attacked the "significance" of the MRI and CT exams conducted in 1991, stating that "[w]hile these exams apparently revealed evidence of some degree of degenerative disk [sic] disease, there does not appear to be corroborating objective clinical findings in the medical records provided at that time to indicate that [Plaintiff] suffered from specific neurological deficits or functional limitations as a result of disk [sic] disease."  (AR 1022-1023.)

### a.    Objective Evidence of Disability

"With respect to the requirement of objective evidence, the Second Circuit has not squarely addressed this issue."  *Aitkins ex rel. Casillas v. Park Place Entm't Corp.*, 06-CV-4814, 2008 WL 820040, at *14 (E.D.N.Y. Mar. 25, 2008).  "However, several courts in this district have found that it is not unreasonable or arbitrary for a plan administrator to require the plaintiff to produce objective medical evidence of total disability in a claim for disability benefits." *Aitkins ex rel. Casillas*, 2008 WL 820040, at *14 (citing *Fitzpatrick v. Bayer Corp.*, 04-CV-5134, 2008 U.S. Dist. LEXIS 3532, at *32-33, 2008 WL 169318 [S.D.N.Y. Jan. 17, 2008] [collecting cases]); *see also Fedderwitz v. Metro. Life Ins. Co., Inc.'s Disability Unit*, 05-CV-10193, 2007 U.S. Dist. LEXIS 72702, at *26, 2007 WL 2846365 (S.D.N.Y. Sept. 27, 2007) ("[A]s a general matter, courts in this Circuit have declined to find unreasonable a decision to favor objective over subjective medical evidence."); *Graham v. First Reliance*

*Standard Life Ins. Co.*, 04-CV-9797, 2007 U.S. Dist. LEXIS 55324, at *27, 2007 WL 2192399

(S.D.N.Y. July 31, 2007) ("First Reliance's decision to credit objective evidence over subjective

evidence was not unreasonable or illegitimate."); *Parisi v. Unumprovident Corp.*, 03-CV-01425,

2007 U.S. Dist. LEXIS 93472, at *28, 2007 WL 4554198 (D. Conn. Dec. 21, 2007) ("[T]he very

concept of proof connotes objectivity. . . . Thus, it is hardly unreasonable for the administrator to

require an objective component to such proof.") (citations and quotation marks omitted).

Between 1988 and 2006, at least six different doctors, including Dr. Carr, have diagnosed

Plaintiff with L4-5 degenerative disc disease.  In addition, it is undisputed that Plaintiff suffers

from lower back pain, and that these disabilities were sufficient from 1991 to 2004 for Plaintiff

to receive LTD benefits.  Moreover, in 1988, Plaintiff had an MRI, which revealed "loss of disc

height at L4-5 and L5-S1 and degenerative disc disease."  (AR 965.)  In 1991, Plaintiff received

another MRI, which yielded the same results.  (AR 157.)  In addition, a CT was performed on

Plaintiff, which yielded the same results.  (*Id*.)

Stated another way, it is accepted that Plaintiff's medical condition is not likely to

improve, and that he has suffered from the same disease since at least 1988.  Moreover, three

separate "objective examinations" confirm the diagnoses of the six physicians.  Accordingly, the

Court finds that further testing is not necessary to conclude that Plaintiff suffers from L4-5

degenerative disc disease.[23]  In addition, whether or not there is evidence that Plaintiff suffers

from "neurological deficits" does nothing to refute the credibility of three separate exams and six

separate professional evaluations that all concluded that Plaintiff suffers from L4-5 degenerative

disc disease.

---

[23]     Dr. Carr noted as much in his IME report when he stated that Plaintiff "does not
require any diagnostic testing for a back problem that is at least 16 years old."

Having said that, the Court also finds that there is objective evidence that Plaintiff has suffered "functional limitations as a result of disk [sic] disease." First, it is undisputed that Plaintiff currently walks with a cane, and is limited in his ability to walk, stand, sit and bend. Second, in 1988, Plaintiff was held out of work by his physician for a period of time because of chronic back pain. (AR 687, 700.) Then, after his physician cleared him to return to work, just two days prior to returning, Plaintiff's left leg gave out, causing him to fall and break his wrist. (AR 687, 700.)

For all of these reasons, the Court finds that a conclusion that there is a lack of objective evidence that demonstrates that Plaintiff suffers from functional limitations as a result of his disease is not a sufficient ground (either alone or together with the other record evidence in this case) for termination Plaintiff's LTD benefits claim.

b.     **Subjective Complaints**

"It has long been the law of this Circuit that 'the subjective element of pain is an important factor to be considered in determining disability.'" *Connors v. Conn. Gen. Life Ins. Co.*, 272 F.3d 127, 136 (2d Cir. 2001) (citation omitted). Nevertheless, "acceptance of [P]laintiff's subjective complaints of pain is by no means required of the administrator." *Kellner v. First Unum Life Ins. Co.*, 589 F. Supp.2d 291, 308 (S.D.N.Y. 2008) (finding also that the plan administrator is "entitled to rely on its independent medical reviewers' opinions regarding the medical records in [Plaintiff's] claim file; no 'in-person, physical examination of [Plaintiff]' was necessary.") (internal quotation marks and citations omitted); *see also Parisi,* 2007 WL 4554198, at *14 ("[T]he court finds no reason to give the opinions of Parisi's treating physicians any special weight. Because there was no objective evidence of Parisi's symptoms, the medical assessments of Parisi's doctors were based solely on Parisi's subjective complaints of pain. Such

assessments carry little weight in supporting disability claims, and the plan administrator is not required to accept them.").

However, "[a]lthough the Committee need not have explained exactly why they chose to credit one medical evaluation over another, cases in this Circuit have found a plan administrator's decision to deny disability benefits to be arbitrary and capricious for providing conclusory or illogical reasons for that denial, or for not sufficiently reconciling conflicting medical diagnoses." *Suarato*, 554 F. Supp.2d at 421 (citing *Karce v. Bldg. Serv. 32B J Pension Fund*, 05-CV-9142, 2006 WL 3095962, at *8 [S.D.N.Y. Oct. 31, 2006]) (finding the Appeals Committee failed to give the claimant a full and fair review when the Committee based their decision on "a catalogue of bits and pieces of evidence that conflict and, in some cases, ignore more recent pronouncements by the same doctors"); *Giraldo v. Bldg. Serv. 32B-J Pension Fund*, 04-CV-3595, 2006 WL 380455, at *4 (S.D.N.Y. Feb. 16, 2006) (finding the Committee "failed to properly consider plaintiff's application for benefits" when "[t]he Committee based their denial of plaintiff's physical disability claim on [a doctor's] one-sentence conclusion that plaintiff is fit for sedentary work," with no explanation of what type of sedentary work the plaintiff could perform or find); *Brown v. Bd. of Trs. of Bldg. Serv. 32B-J Pension Fund*, 392 F. Supp.2d 434, 443 (E.D.N.Y. 2005) (finding a plan administrator's decision arbitrary and capricious when the decision "provide[d] only a conclusory reason for rejecting a claim, e.g., because the claimant did not meet the plan definition for disability, without explaining why the claimant did not meet the plan definition for disability"); *Nerys v. Bldg. Serv. 32B-J Health Fund*, 03-CV-0093, 2004 WL 2210256, at *9 (S.D.N.Y. Sept. 30, 2004) (finding the Committee's denial of claimant's appeal to be arbitrary and capricious for failing to "provide . . . a specific reason or reasons for the denial of the appeal"); *Cejaj v. Bldg. Serv. 32B-J Health Fund*, 02-CV-6141, 2004 WL

414834 at *9 (S.D.N.Y. Mar. 5, 2004) (finding the Committee failed to conduct a full and fair review when they "failed to elucidate whether and how they had reconciled the reports from plaintiff's treating physicians, who diagnosed plaintiff as permanently and completely disabled . . ., with reports from their own expert, . . . who determined that plaintiff was fit to return to work, albeit of some unspecified kind.").

Here, as noted in Part III.C.5.a. of this Decision and Order, there is objective evidence of both Plaintiff's disability and the functional limitations that Plaintiff suffers from as a result of that disability.  Therefore, the Court finds that Defendants' assertion that Plaintiff's disability rests almost entirely on self-reported back pain is incorrect.

For these reasons, the Court finds that Defendants' conclusion that Plaintiff's claim of disability rests almost entirely on self-reported back pain was not based on substantial evidence, and was therefore not a sufficient ground (either alone or together with the other record evidence in this case) upon which to terminate Plaintiff's LTD benefits.

### 6.    Three Entry-Level Sedentary Jobs

Defendants assert that the TSA identified three different entry-level sedentary jobs that Plaintiff is capable of performing, and therefore, under the Plan, he is not "totally disabled."[24] The TSA's findings rely on the FCE's conclusion that Plaintiff is capable of performing sedentary work.  As a result, the TSA's findings cannot be relied on.  *See Rappa*, 2007 WL 4373949, at *10 (a TSA based on a faulty FCE "cannot be relied upon"); *Alfano*, 2009 WL 222351, at *19.

For these reasons, the Court finds that relying on the findings of the TSA does not form a

---

[24]    It should be noted that the TSA failed to consider the availability of any of these three entry-level sedentary jobs in the regional economy.

40

sufficient ground (either alone or together with the other record evidence in this case) upon which to terminate Plaintiff's LTD benefits.

### D.      Conclusion

In Part III.C. of this Decision and Order, the Court has identified the deficiencies in each of the six pieces of evidence relied upon by Defendants in revoking and terminating Plaintiff's benefits.  These deficiencies are exacerbated by the conflict of interest and procedural irregularities discussed above in Parts III.A. and III.B. of this Decision and Order.

Simply stated, absent a capricious (or intentionally bad faith) motive, there is nothing in the record that could explain to the Court why Liberty Mutual took the following actions 13 years after Plaintiff had been granted benefits: (1) after becoming the Plan Administrator, *sua sponte* asked a vocational case manager to provide a "hypothetical" assessment of jobs that Plaintiff could obtain "if" he were able to perform "sedentary-light work"; (2) *sua sponte* re-opened Plaintiff's file despite the development of no new objective evidence showing that his condition had changed during the previous 13 years; (3) questioned the "significance" of prior medical examinations (the MRI and CT exams performed in 1991), while failing to ask that Plaintiff undergo new objective testing; (4) stated that Plaintiff's treating physician agreed with the exam findings of Cindy Bush, despite the fact that Plaintiff's treating physician clearly stated that he did not agree with the conclusions of the FCE; and (5) relied on several immaterial facts, such as Plaintiff's failure to attend a pain management program in 1991, in deciding to revoke and terminate his benefits.

For all these reasons, the Court concludes that Defendants' decision to revoke and terminate Plaintiff's LTD benefits was arbitrary and capricious.

### E.      Remedy

"[R]emand of an ERISA action seeking benefits is inappropriate where the difficulty is not that the administrative record was incomplete but that a denial of benefits based on the record was unreasonable." *Zervos v. Verizon N.Y., Inc*., 277 F.3d 635, 648 (2d Cir. 2002) (internal quotation marks and citation omitted).  Moreover, "[t]hat [Plaintiff] was awarded benefits but subsequently lost them because of [Defendants'] improper action further weighs against remand, as the remedy that restores the status quo ante in such situations is retroactive reinstatement and continuation of benefits." *Alfano*, 2009 WL 222351, at *23 (citing *Medoy v. Warnaco Employees' Long Term Disability Ins. Plan*, 97-CV-6612, 2008 WL 4483380, at *8 [E.D.N.Y. Sept. 30, 2008]); *Hackett v. Xerox Corp. Long-Term Disability Income Plan*, 315 F.3d 771, 776 (7th Cir. 2003).  Accordingly, Defendants' decision terminating Plaintiff's LTD benefits is reversed, and the benefits shall be retroactively reinstated and continued.

**ACCORDINGLY**, it is

**ORDERED** that Plaintiff's motion for summary judgment (Dkt. No. 50) is **<u>GRANTED</u>**; and it is further

**ORDERED** that Defendants'  motion for summary judgment (Dkt. No. 42) is **<u>DENIED</u>**; and it is further

**ORDERED** that Plaintiff's LTD benefits be retroactively reinstated from 12/30/04 and continued; and it is further

**ORDERED** that Plaintiff submit a proposed order with regard to the total amount Plaintiff claims he is due for retroactive LTD benefits from 12/30/04 to the present, including the method used for calculating same; and it is further

**ORDERED** that Plaintiff demonstrate to the Court, within **TEN (10) DAYS** of this

Decision and Order, good cause for its failure to serve Liberty Life Assurance Company of

Boston and Liberty Mutual.  In the event that Plaintiff fails to proffer a satisfactory explanation

to the Court within ten (10) days, the Court shall *sua sponte* **DISMISS** these two entities from

the instant action.

Dated:  September 29, 2009
      Syracuse, New York

Hon. Glenn T. Suddaby
U.S. District Judge